IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. _____

| | |
|---|---|
| MADISON JOHNSON and ELVIN DOWLING, *Individually and on Behalf of a Class of All Others Similarly Situated,*<br><br>Plaintiffs,<br><br>v.<br><br>WANABANA LLC and WANABANA USA LLC,<br><br>Defendants. | **CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs, Madison Johnson and Elvin Dowling (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated allege the following class action complaint against WanaBana LLC and WanaBana USA LLC (collectively "WanaBana" or "Defendants").

## Introduction

1.     This is a class action brought on behalf of persons who purchased certain WanaBana apple sauce and apple cinnamon fruit puree pouches from Defendants (collectively "products"). Defendants manufactured, marketed, and sold these products while recklessly or intentionally failing to disclose they were toxic and unfit for human consumption and contained hazardous levels of lead, as well as high levels of chromium and potentially other toxic materials.

2.     On October 31, 2023, Defendants announced a recall of approximately 1.74 million units of their cinnamon apple sauce and puree products due to elevated levels of lead.

By the time WanaBana had issued the recall, its products had been consumed by likely hundreds of thousands of people.

3.     The lead levels in the WanaBana products are extraordinarily dangerous. U.S. Food and Drug Administration ("FDA") testing of samples of the cinnamon used by WanaBana revealed lead levels reached more than 2,000 times the proposed international standard. WanaBana sold products with hundreds of times the maximum permissible lead levels. The products also contained high levels of chromium. WanaBana marketed these toxic products as safe, healthy, and "ideal" for families and children.

4.     WanaBana's sale of these products has sickened at least hundreds of people, with the Centers for Disease Control and Prevention ("CDC") identifying the vast majority as children and infants. Young children and infants are particularly vulnerable to lead poisoning because lead is absorbed more readily into their growing bodies. Moreover, the long-term and severe impact of lead poisoning on this scale may take years to fully manifest.

5.     In its marketing and labeling of the Cinnamon Apple products, WanaBana does not disclose that these food items contain *any* amount of lead or chromium—let alone the poisonous quantities they actually contained. Defendants also failed to disclose their products were unsafe and unfit for human consumption, and otherwise worthless.

6.     On the contrary, WanaBana prominently advertises their products as "Only Fruit" and tout the products as having high quality, purity, and safety.

7.     The advertising and packaging of these products is consequently materially false, deceptive, and misleading, and reasonably likely to deceive the public.

8.     Lead is highly toxic and dangerous when consumed. There is no minimum level that is considered "safe," and consumption poses obvious and well-documented serious health

risks to humans.  In addition to causing cancer, these heavy metals can impair kidneys, the liver, bones, brain development, and other key organs and systems.  Given such health risks, the presence of even small lead in food items, much less the extreme quantities discovered, is material to reasonable consumers.

9.      Chromium, while not as well as understood as lead poisoning, can also be significantly toxic.  Acute ingestion of chromium may result in abdominal pain, nausea, vomiting, diarrhea, anemia, renal and hepatic dysfunction.[1]

10.     To their detriment, Plaintiffs relied on WanaBana's misrepresentations and assurances that these fruit puree pouches contained only those ingredients listed on the packaging and labeling, and that they were safe and fit for human consumption.  Had Plaintiffs known these food items contained heavy metals like lead and chromium, they would not have purchased the contaminated products on the same terms and prices, if at all.

11.     Because of the high level of latency in the appearance of some of the most serious effects of lead poisoning, Plaintiffs and class members may suffer anxiety and stress for years while waiting to discover if they or a family member who consumed the toxic products may become sick or suffer growth or other health or developmental problems.

12.     Through this action, Plaintiffs, both individually and on behalf of classes of other similarly situated purchasers of WanaBana products, seek all applicable and available relief and damages under the laws of Florida and the United States.

**PARTIES**

13.     Plaintiff Madison Johnson is a citizen and resident of Port Charlotte, Florida.

---

[1]https://www.fda.gov/food/outbreaks-foodborne-illness/investigation-elevated-lead-levels-cinnamon-applesauce-pouches-november-2023 (last accessed 1/5/2024)

During October 2023, Plaintiff Johnson purchased Defendants' products and these products were consumed by Plaintiff Johnson's young children.  When Plaintiff Johnson learned of the recall in Mid-November and had her 1-year-old daughter tested for lead, the results from two tests showed a very high lead concentration of 10.0 and 9.2 µg/dL respectively.  For context, the CDC recommends clinical monitoring for any child with a blood level over 3.5 µg/dL. Plaintiff Johnson's daughter had normal lead levels in a physical examination in September, so the only possible source of the massive increase in blood lead levels is Defendants' products which were purchased in Mid-October.  The effects of lead poisoning can take years to manifest and Plaintiff Johnson suffers stress every day waiting to see what the ultimate impact may be on her baby. Plaintiff Johnson reasonably relied upon Defendants' express and implicit statements that the products were safe, healthy, and fit for human consumption.  Plaintiff Johnson would never have purchased the products had Defendants had disclosed the products were contaminated.  Plaintiff Johnson suffered economic harm as a result.

14.     Plaintiff Elvin Dowling is a citizen and resident of Miramar, Florida.  During 2023, Plaintiff Dowling purchased Defendants' products and these products were consumed by Plaintiff Dowling's children.  Plaintiff Dowling reasonably relied upon Defendants' express and implicit statements that the products were safe, healthy, and fit for human consumption. Plaintiff Dowling would never have purchased the products had Defendants had disclosed the products were contaminated. Plaintiff Dowling suffered economic harm as a result.

15.     Defendant WanaBana LLC is a national limited liability corporation organized and existing under the laws of Florida.  Its principal office is at 9405 N. Miami Avenue, Miami Shores, Florida.

16.     Defendant WanaBana USA LLC is a Florida limited liability corporation with its principal office located at 1413 Ponce de Leon Avenue, Suite 301, San Juan, Puerto Rico.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because at least one class member is a citizen of a state other than that of Defendants, there are at least 100 class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

18.     This Court has personal jurisdiction over Defendants WanaBana LLC and WanaBana USA LLC because they are registered business entities in Florida, regularly conduct business in the state, sold their products in the state, made false and deceptive statements, representations, and omissions about their products to customers residing in the state, and otherwise have sufficient personal contacts to permit the exercise of personal jurisdiction.

19.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in this District, at least one Plaintiff resides in the district, and Defendants substantial business, including the sale and marketing of products, constitutes purposeful availment and easily satisfies the requirement for sufficient minimum contacts with the District.

## FACTUAL ALLEGATIONS
### WanaBana Represented That Its Products Were Healthy, High Quality, and Safe

20.     WanaBana promoted and is continuing to promote their products as healthy, high quality, and safe.

21.     WanaBana markets its fruit puree pouches as "The ideal snack for the whole family" and as safe for young children (see below).[2] During the class period, this also included WanaBana's contaminated apple cinnamon fruit puree pouches.



22.     WanaBana marketed their products in this manner with the understanding it would likely induce families, including families with very young children, to purchase and consume their products.

23.     WanaBana also represented that their products had extensive safety and quality control practices and that they "guarantee the excellence of our food processes" and "ensur[e] a product with worldwide safety and quality."  They also cited several certifications as proof of their quality and purity.[3]



---

[2]See https://wanabana.com (Last accessed 1/4/2024)
[3]*Id.*

24.     WanaBana did not limit their representations to generalized statements about safety and quality, but it made specific representations about their quality, safety, control, and security policies.  WanaBana promised their "controlled processes" and "food safety management system" would "guarantee the safety of [their] products."  WanaBana's representations constituted an unambiguous guarantee and affirmation of the quality of their food products.[4] WanaBana represented it had a production line with "the highest standards in the market" and that their products met "quality, safety, legality, and authenticity parameters in line with "nationally and internationally recognized quality standards."[5] They also advertised that their engineers would "supervise and direct all production processes, and approve each production that will be exported."[6] A reasonable consumer would understand this to mean WanaBana supervised and directed all steps in the production process to ensure the safety and quality of the products that were exported, including their applesauce cinnamon puree pouches.



_____

[4]*See* https://wanabana.com/about-us (last accessed 1/4/24)
[5]*Id.*
[6]https://wanabana.com/wp-content/uploads/2020/07/frutas.pdf (last accessed 1/4/24)

Our products not only maintain the fruit's organoleptic and nutritional characteristics, but also carry a production line with the highest standards in the market, evidenced in the certifications obtained year after year.

      

Our quality commitment starts at the farms were our agricultural engineers supervise and direct all production processes, and approve each production that will be exported.

25.     WanaBana made these representations with the express intent to induce customers to purchase the products under the false belief the products were exceptionally safe, high qualify, authentic, and otherwise fit for human consumption.

26.     WanaBana understands that reasonable customers, including customers like Plaintiffs, want to purchase safe and high-quality food.

27.     WanaBana understands that reasonable customers, including customers like Plaintiffs, would not wish to purchase and consume products, or at a minimum would pay much less for, products that are low quality, unsafe, and contain dangerous levels of heavy metals such as lead and chromium.

28.     WanaBana understood that reasonable consumers would likely consume multiple of the pouches each. Indeed, many of the contaminated products were sold in packs of three.

29.     WanaBana failed to inform customers that their Products were contaminated with high levels of lead, chromium, and were not fit for human consumption.  WanaBana also failed to inform customers about the even greater risks posed by consuming more than one of

these Products or the extraordinary risk the Products would pose to infants and very young children.

30.      WanaBana did not inform customers that their apparent oversight and quality assurance was either insufficient to detect massive lead contamination in the cinnamon used in the WanaBana products, or it was complicit in what the FDA has described as "economically motivated" adulteration of the spice.[7]

31.      WanaBana failed to disclose that the cinnamon powder used in their products may have been intentionally adulterated.  Nor did it include lead anywhere on the list of ingredients on their packaging of the Product or on their website.

32.      WanaBana did not inform customers their Products contained health hazards similar to those associated with lead contamination.  In fact, WanaBana did not inform customers that their Products had any dangers or toxicity at all.

33.      Based on WanaBana's representations and omissions, on information and belief, at least hundreds of thousands of individuals, including Plaintiffs, purchased WanaBana's dangerous and contaminated products within the United States.

**WanaBana's Products Were Contaminated with Heavy Metals.**

34.      On October 31, 2023, WanaBana announced a voluntary recall of its Apple Cinnamon Fruit Puree products due to "elevated lead levels."[8]

---

[7] https://www.politico.com/news/2023/12/14/applesauce-pouches-may-have-been-contaminated-on-purpose-fda-foods-chief-says-00131797 (Last accessed 1/5/2024).

[8] https://wanabana.com/wp-content/uploads/2023/11/Press-Release.pdf (Note that although WanaBana dated the recall notice for October 29, 2023 it does not appear to have actually issued the recall until October 31, 2023).

35.     A large number of WanaBana Apple Cinnamon Fruit Puree pouches were included in the recall.  This recall notice indicated that approximately 1.74 million "units" were impacted by the recall.

36.     On November 9, 2023, WanaBana expanded their recall announcement to include information on recalled Schnucks and Weis brand cinnamon applesauce pouches.[9]

37.     Prior to the recall, the State of North Carolina had been investigating multiple reports of children with badly elevated blood levels indicative of acute lead toxicity.  This investigation found that the affected children had all consumed WanaBana Products as the shared source of exposure, and North Carolina's testing of WanaBana products revealed they had extremely high concentrations of lead.[10]

38.     When this information was shared with the FDA, the FDA confirmed North Carolina's findings of extremely high lead levels, which could result in acute toxicity.  The FDA contacted WanaBana about the extremely high concentrations of lead in their product on October 28.  Subsequently, WanaBana issued the product recall.

39.     The lead levels detected by the FDA in WanaBana Products were extremely high. For example, initial testing of certain WanaBana Products indicated lead levels *more than 200 times greater than the FDA's action level* for fruit purees and similar products intended for babies and young children.[11]

40.     The FDA subsequently investigated the "Astrofoods" manufacturing facility in Ecuador used by WanaBana.  FDA testing revealed the cinnamon used in WanaBana products

---

[9] https://www.fda.gov/food/outbreaks-foodborne-illness/investigation-elevated-lead-levels-cinnamon-applesauce-pouches-november-2023 (last accessed 1/5/2024)
[10] *Id.*
[11] *Id.*

was contaminated by lead levels up to 5,110 parts per million (ppm). For context, the international standard-setting body has a proposed lead limit of 2.5 ppm.[12]

41.     Despite WanaBana claiming to "guarantee the safety of our products" and assurances that "agricultural engineers supervise and direct all production processes, and approve each production that will be exported," WanaBana either did not detect lead levels *more than 2000 times the international standard*, or it choose not to act upon the discovery of extreme quantities of lead in their food.

42.     The FDA has indicated they believe the extremely high levels of lead, and the other signals they have seen, indicate the cinnamon was likely intentionally adulterated and that the contamination was economically motivated.[13]

43.     On January 5, 2024, the FDA announced that WanaBana's cinnamon and recalled products also contained elevated levels of chromium contamination as high as 1201 ppm in the cinnamon.  At high levels chromium can cause toxicity and the more toxic form of chromium is "chromium (VI)."  The quantity of chromium detected by the FDA and the lead-to-chromium ratio is consistent with lead chromate ($PbCrO_4$).

44.     Lead chromate typically appears as a yellow, orange, and red power and is often used as a pigment in a powder or paint.  It is carcinogenic, a neurotoxin, and a nephrotoxin. Lead chromate primarily affects the lungs, but it can also affect the gastrointestinal tract, liver, kidneys, and immune system.  Lead chromate also contains the most toxic form of chromium (chromium VI).[14]

---

[12]*Id.*

[13]https://www.politico.com/news/2023/12/14/applesauce-pouches-may-have-been-contaminated-on-purpose-fda-foods-chief-says-00131797

[14]https://pubchem.ncbi.nlm.nih.gov/compound/Lead-chromate

45.     Adulteration of spices using lead chromate compounds has been documented globally as a growing public health concern.  It has contributed to lead poisoning for children and adults around the world.[15]

46.     On information and belief, lead chromate or a similar toxic compound was likely used to intentionally adulterate the cinnamon used in the WanaBana products.

47.     Defendants either knew, or should have known, that their Products may have been contaminated prior to the recall.

48.     Defendants either knew, or should have known, that their representations about the quality of their production facilities, safety, supervision, and other assurances about and related to the health and quality of their product were false or were made with reckless disregard for the truth.

49.     Defendants either knew or should have known that their false representations or the representations they made with reckless disregard for the truth concerning the quality of their product endangered their customers, including young children, who relied on the representations.

50.     As a result of defendants' misrepresentations and omissions, at least hundreds of thousands of people consumed the dangerous and toxic WanaBana products.

**WanaBana's Contaminated Products Sicken Consumers**

51.     As discussed above, the lead quantities within WanaBana's products were extremely high, hundreds of times higher than what could be considered "safe" levels.

---

[15]https://pubs.acs.org/doi/10.1021/acs.est.2c03241#:~:text=Lead%20adulteration%20of%20spices%2C%20primarily,and%20time%2Dconsuming%20laboratory%20analyses. (last accessed 1/5/2024).

52.     The consensus in the scientific community is that there is no level of lead that is safe.  According to the Mayo Clinic,

> Lead poisoning occurs when lead builds up in the body, often over months or years. Even small amounts of lead can cause serious health problems. Children younger than 6 years are especially vulnerable to lead poisoning, which can severely affect mental and physical development. At very high levels, lead poisoning can be fatal.[16]

53.     In other words, "[n]o amount of lead is known to be safe."[17] Lead exposure can cause anemia, weakness, and kidney and brain damage.[18] Lead affects almost every organ and system in the body and accumulates over time, leading to severe health risks and toxicity, including inhibiting neurological function, anemia, kidney damage, seizures, and in extreme cases, even coma and death.[19] For adults, lead can accumulate in bones, where it is stored and then later released into the blood, re-exposing organ systems long after an original exposure.[20]

54.     Lead poses even higher risks to pregnant women because it can cross the fetal barrier, potentially harming the developing fetus and resulting in reduced growth and premature birth.[21]

---

[16] *See* https://www.mayoclinic.org/diseases-conditions/lead-poisoning/symptoms-causes/syc-20354717.

[17] *See* Jessica Pupovac, *Lead Levels Below EPA Limits Can Still Impact Your Health*, NPR (Aug. 13, 2016), https://www.npr.org/sections/thetwoway/2016/08/13/489825051/lead-levels-below-epalimits-can-still-impact-your-health.

[18] *See The National Institute for Occupational Safety and Health (NIOSH): Lead*, https://www.cdc.gov/niosh/topics/lead/workerinfo.html (last visited January 12, 2024).

[19] *See id.*

[20] *See* State of New York Department of Health, "Lead Exposure in Adults: A Guide for Health Care Providers," https://www.health.ny.gov/publications/2584.pdf.

[21] *See* Center for Disease Control and Prevention: Childhood Lead Poisoning Prevention, Pregnant Women, https://www.cdc.gov/nceh/lead/prevention/pregnant.htm (last visited January 12, 2024).

55.     As of January 5, 2024, the CDC has identified at least 321 cases of lead poisoning linked to contaminated WanaBana products across 38 states.  Of these cases, 86 were confirmed as caused by WanaBana Products, 209 are probable, and 26 are suspected as being caused by the Products.[22] Most of those sickened are young children, and the median age for those affected is *one year old*.[23]

56.     Lead poisoning is especially dangerous for very young children because their bodies are still growing and developing rapidly.  Lead can be absorbed more readily, and it can take years for latent symptoms to become apparent.  Although children with lead exposure may have no acute symptoms, even low levels of lead have been associated with learning and behavior problems, hearing and speech problems, and slowed growth and development.  This can show up as lower IQ, decreased ability to pay attention, and underperformance in children.  Children exposed to large amounts of lead can also develop acute symptoms including severe neurological symptoms (including seizures, encephalopathy, and coma), weakness and fatigue, anemia, and abdominal pain, constipation, and nausea.[24]

57.     In addition to the lead, the chromium in defendants' contaminated products represents a significant health risk.  Although chromium is naturally occurring and may be normally found within a diet, at high levels it is toxic.  Moreover, there is a significant difference between trivalent chromium (chromium (III)) and the significantly more toxic hexavalent chromium (chromium (VI)). Chromium (VI) is a known carcinogen and has been

---

[22]https://www.cdc.gov/nceh/lead/news/lead-poisoning-outbreak-linked-to-cinnamon-applesauce-pouches.html (Last accessed January 11, 2024).
[23]https://www.fda.gov/food/outbreaks-foodborne-illness/investigation-elevated-lead-levels-cinnamon-applesauce-pouches-november-2023
[24]https://www.cdc.gov/nceh/lead/news/lead-poisoning-outbreak-linked-to-cinnamon-applesauce-pouches.html

associated with other health effects when ingested including irritation, ulcers, and anemia. Although the health effects of eating food contaminated with chromium (VI) are not well understood, there is also no antidote to treat chromium exposure.[25]

58.     As discussed earlier, chromium (VI), the more toxic and dangerous form of chromium, is found in lead chromate.  Lead chromate is a colorful powder with a history of being used as an adulterant for spices (including turmeric) and is toxic.  The ratios of lead and chromium found in Defendants' Products are consistent with the Products being contaminated with lead chromate.

59.     Lead chromate is considered a hazardous substance in the United States for several reasons including its carcinogenic nature, its risk of causing lead poisoning, and its risk of causing kidney and brain damage, among other major health concerns.[26]

60.     The cinnamon used in Defendants' Products was likely intentionally contaminated by lead chromate or a chemically similar toxic compound.

**WanaBana's Misrepresentations and Omissions Were Material**

61.     At all releveant times, WanaBana's Cinnamon Apple Puree products were unsafe, unfit for human consumption, and otherwise worthless.

62.     WanaBana knew or should have known the products may have contained dangerous levels of lead, chromium, and other contaminants.

63.     WanaBana knew or should have known that its statements about production line quality and monitoring were untrue and were likely to mislead customers.

---

[25]*Id.*
[26]https://nj.gov/health/eoh/rtkweb/documents/fs/1102.pdf

64.     WanaBana knew or should have known that its statements about product safety, product purity, health benefits, and its safety guarantee were untrue and were likely to mislead customers.

65.     As a result of WanaBana's statements, representations, and omissions, Plaintiffs and class members purchased WanaBana products.  Indeed, had WanaBana not made its misrepresentations or disclosed that the Products were contaminate, no reasonable consumer would have purchased the Product.

## CLASS ACTION ALLEGATIONS

66.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of themselves and the proposed classes defined below:

> All persons who purchased the contaminated WanaBana products (including the Apple Cinnamon Fruit Puree Pouchs, the Schnucks-brand cinnamon applesauce pouches, and Weis-brand cinnamon applesauce pouches) in the United States (the "Nationwide Class").

67.     Within the Nationwide Class, there is a Subclasses defined as follows:

> All persons who purchased the contaminated WanaBana products (including the Apple Cinnamon Fruit Puree Pouchs, the Schnucks-brand cinnamon applesauce pouches, and Weis-brand cinnamon applesauce pouches) in the State of Florida.

68.     Excluded from the Nationwide Class and State Subclass are governmental entities, WanaBana, any entity in which WanaBana has a controlling interest, and WanaBana's officers, directors, affiliates, legal representatives, co-conspirators, successors, subsidiaries, and assigns.  Also excluded from the Nationwide Class and Subclass are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.  This action is brought and may be properly maintained as a class action pursuant

to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of these rules.

69.     ***Numerosity Under Rule 23(a)(1).***  The Nationwide Class and State Subclass are so numerous that the individual joinder of all members is impracticable, and the disposition of the claims of all members of the Nationwide Class and Subclass in a single action will provide substantial benefits to the parties and the Court.  Although the precise number of members of the Nationwide Class and Subclasses are unknown to Plaintiffs at this time, on information and belief, the proposed Nationwide Class and Subclass contain at least thousands of purchasers of the contaminated WanaBana products who have been damaged by WanaBana's conduct as alleged herein.  Discovery will reveal, through sales and distribution records, the approximate number of members of the Nationwide Class and Subclass.

70.     ***Commonality Under Rule 23(a)(2).***  Common legal and factual questions exist that predominate over any questions affecting only individual members of the Nationwide Class and Subclass.  These common questions, which do not vary among members of the Nationwide Class or Subclass and which may be determined without reference to any Nationwide Class or Subclass member's individual circumstances, include:

   (a)  Whether WanaBana learned that the products were contaminated by lead;

   (b)  Whether the cinnamon used in WanaBana's cinnamon applesauce products was intentionally adulterated;

   (c)  Whether WanaBana had a duty of care to its customers;

   (d)  Whether WanaBana had a duty to disclose the presence of dangerous materials, like lead, in its products;

   (e)  Whether WanaBana breached a duty of care to its customers when it sold dangerously toxic products;

(f) Whether WanaBana breached a duty to disclose when they failed to disclose hazardous quantities of lead;

(g) Whether WanaBana's made false or misleading statements, including but not limited to statements about their products purity and health benefits, their supervision of all production processes, and their product safety and quality control;

(h) Whether WanaBaba's representations and omissions in its advertising and labeling are false, deceptive, or misleading;

(i) Whether WanaBana's representations and omissions in its advertising and labeling are likely to deceive a reasonable consumer;

(j) Whether WanaBana had knowledge that its representations and omissions in its advertising and labeling were false, deceptive, or misleading;

(k) Whether WanaBana engaged in unlawful, fraudulent, or unfair business practices;

(l) Whether WanaBana's conduct violated the applicable state consumer protection laws alleged herein;

(m) Whether, as a result of WanaBana's omissions and/or misrepresentations of material facts, Plaintiffs and members of the Nationwide Class and Subclass have suffered an ascertainable loss of monies and/or property and/or value;

(n) Whether Plaintiffs and the members of the Nationwide Class or Subclasses have been damaged by the wrongs alleged and are entitled to actual, statutory, treble, and punitive damages; and

(o) Whether Plaintiffs and members of the Nationwide Class and Subclasses are entitled to declaratory and injunctive relief.

71.    ***Typicality Under Rule 23(a)(3).***  Plaintiffs' claims are typical of the Nationwide Class and Subclass members' claims.  WanaBana's course of conduct caused Plaintiffs and members of the Nationwide Class and Subclass the same harm, damages, and losses as a result of WanaBana's uniformly unlawful conduct.  No reasonable customer would ever purchase or consume a WanaBana product if they understood that product contained hundreds or thousands

of times the maximum "safe" lead level.  Likewise, Plaintiffs and other members of the

Nationwide Class and Subclasses must prove the same facts o establish the same claims.

72.     ***Adequacy of Representation Under Rule 23(a)(4).***  Plaintiffs are adequate

Nationwide Class and Subclass representatives because they are Nationwide Class and

Subclass members, and their interests do not conflict with the interests of the Nationwide Class

or Subclass.  Plaintiffs have retained counsel competent and experienced in complex litigation

and consumer protection class action matters such as this action, and Plaintiffs and their

counsel intend to vigorously prosecute this action for the Nationwide Class and Subclass's

benefit and have the resources to do so.  Plaintiffs and their counsel have no interests adverse to

those of the other members of the Nationwide Class or Subclass.

73.     Further, Plaintiffs have standing to represent members of the putative classes

because there is sufficient similarity between the specific products purchased by Plaintiffs and

the other WanaBana products that are the subject of this action.  WanaBana's products

uniformly failed to include labeling to indicate to consumers that these food items were

contaminated with high levels of lead.

74.     ***Superiority.***  A class action is superior to all other available methods for the fair

and efficient adjudication of this controversy because individual litigation of each Nationwide

Class and Subclass member's claim is impracticable.   The damages, harm, and losses suffered

by the individual members of the Nationwide Class and Subclass will likely be small relative to

the burden and expense of individual prosecution of the complex litigation necessitated by

WanaBana's wrongful conduct.  Even if each Nationwide Class and Subclass member could

afford individual litigation, the Court system could not.  It would be unduly burdensome if

thousands of individual cases proceeded.  Individual litigation also presents the potential for

inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of

an inequitable allocation of recovery among those individuals with equally meritorious claims.

Individual litigation would increase the expense and delay to all parties and the Courts because

it requires individual resolution of common legal and factual questions.  By contrast, the class

action device presents far fewer management difficulties and provides the benefit of a single

adjudication, economies of scale, and comprehensive supervision by a single court.

75.     As a result of the foregoing, class treatment is appropriate.

**FIRST CLAIM FOR RELIEF**
**Breach of Express Warranty**
***(On Behalf of the Nationwide Class Against All Defendants)***

76.     Plaintiffs, individually and on behalf of the nationwide class and subclass,

incorporate by reference all the allegations contained in paragraphs 1 through 75 of this Class

Action Complaint as if fully set forth herein.

77.     WanaBana is and was at all relevant times a "merchant" under U.C.C. § 2-313

and State U.C.C. provisions.

78.     As part of its regular business activities WanaBana manufactures, markets,

advertises, distributes, and sells products intended for human consumption.

79.     Plaintiffs and nationwide class members formed a contract with WanaBana at

the time of their purchase of the WanaBana Products.

80.     The terms of these contracts included statements of fact and promises made by

WanaBana on both the packaging of the products and through online representations on

Defendants' website, as well as other representations.

81.     These representations and warranties were made to all consumers including

Plaintiffs.

82. Defendants' warranties included but are not limited to the following:

    a. That WanaBana's Products were safe and high quality;

    b. That WanaBana's Fruit Puree Products were suitable for consumption by families, including by young children;

    c. That WanaBana's Products met quality, safety, legality, and authenticity parameters;

    d. That WanaBana's production line has one of the highest standards in the market;

    e. That WanaBana's agricultural engineers supervised, directed, and approved each part of the production process for exports including the WanaBana Fruit Puree Products;

    f. That WanaBana would not approve production that is contaminated and that its supervision was sufficient;

    g. That WanaBana's Apple Cinnamon Puree fruit pouches contained only the ingredients listed on the package; and

    h. That WanaBana's Products met the seven quality certifications noted on its website.  (*See* ¶ 23).

83. Plaintiffs, by use of reasonable care, could not have discovered the breached warranty and incurred the hidden increased risks and unreasonable dangers of consuming WanaBana's products.

84. As a direct and proximate result of WanaBana's breach of its express warranties, Plaintiffs have been injured and damaged in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### Breach of Implied Warranty of Merchantability
### *(On Behalf of the Nationwide Class Against All Defendants)*

85. Plaintiffs, individually and on behalf of the National Class and Florida Subclass, incorporate by reference all the allegations contained in paragraphs 1-75 of this Class Action Complaint as if fully set forth herein.

86.     WanaBana is and was at all relevant times a "merchant" under U.C.C. § 2-313 and State U.C.C. provisions.

87.     WanaBana's contaminated Apple Cinnamon Products are and were at all relevant times "goods."

88.     A warranty that WanaBana's products were in merchantable condition and fit for the ordinary purpose for which these food products are used (and were not otherwise injurious to consumers) is implied by law.  The implied warranty of merchantability is part of the basis for the benefit of the bargain between WanaBana and Plaintiffs.

89.     As discussed above, WanaBana's products are toxic and should not be consumed by anyone.  They contained between hundreds and thousands of times the permissible levels of lead and also contained elevated levels of Chromium.

90.      It is likely that WanaBana's cinnamon was adulterated with lead chromate.

91.     Consumers have been sickened by WanaBana's products, the majority of whom are young children.

92.     The consequences and harm suffered by people who consumed WanaBana products may take years to manifest.

93.     WanaBana's products were entirely unfit for human consumption in any capacity.  They were injurious to customers in the course of ordinary use of the product (eating the food).

94.     WanaBana breached its implied warranty of merchantability.  WanaBana's food was so toxic it was injurious to customers and the contamination at hundreds of times permissible levels makes it unfit for sale.

95.     As a direct and proximate result of WanaBana's breach of the implied warranty of merchantability, Plaintiffs members have been injured and damaged in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
**Unjust Enrichment**
*(On Behalf of the Nationwide Class Against All Defendants)*

96.     Plaintiffs, individually and on behalf of the Nationwide Class, incorporate by reference all the allegations contained in paragraphs 1-75 of this Class Action Complaint as if fully set forth herein.

97.     Plaintiffs purchased WanaBana's applesauce cinnamon products with the belief they were safe and appropriate for human consumption.

98.     When Plaintiffs purchased the Products, they conferred a benefit on WanaBana.

99.     WanaBana knew or should have known the Products were contaminated by dangerous heavy metals such as lead and chromium.

100.     WanaBana did not inform Plaintiffs or any other relevant party of the defects in WanaBana's products prior to WanaBana being advised to conduct a recall by the FDA.

101.     Moreover, WanaBana advertised its Products as premium, high quality, highly certified, and especially safe, including as appropriate for young children and families. Not only did WanaBana fail to disclose the danger of its Products, but it actively marketed them as safe and healthy.

102.     WanaBana should have known that the payments it received from Plaintiffs and like parties were rendered under the belief that the Products were high quality and safe, and were not contaminated by lead and chromium.  It would not be equitable for WanaBana to retain the benefits of the transactions under these circumstances.

103.    It is not equitable for WanaBana to maintain the payments rendered by Plaintiffs when they provided Products that were contaminated.

104.    Plaintiffs and the class are entitled to recover all amounts wrongfully collected and improperly retained by WanaBana, plus interest.

105.    Plaintiffs and the class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available at law.

## FOURTH CLAIM FOR RELIEF
### Negligent Misrepresentation
*(On Behalf of the Nationwide Class Against All Defendants)*

106.    Plaintiffs, individually and on behalf of the Nationwide class, incorporate by reference all the allegations contained in paragraphs 1-75 of this Class Action Complaint as if fully set forth herein.

107.    As alleged herein, WanaBana made material misrepresentations and omissions regarding its Products including regarding the quality of its production line, level of oversight, health and safety of the products, the contents of its products, and the appropriateness of its product for consumption.

108.    WanaBana represented the product this way in order to sell and market the product. WanaBana knew customers prefer premium, healthy, high quality, and safe foodstuffs.

109.    Plaintiffs reasonably relied upon WanaBana's representations.

110.    WanaBana's representations were knowingly false or were made with reckless disregard for the truth.  Either WanaBana lied about the quality of its production line and safety and sent the products to customers without any of the promised safety checks or it was negligent maintaining its quality assurances.

111.    Plaintiffs and the class suffered economic and other damages because of their purchase of the WanaBana product.  Had WanaBana represented the true quality of its product or disclosed it was contaminated with heavy metals, Plaintiffs would not have purchased it or at a minimum would have paid far less.

112.    Plaintiffs and the class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available at law.

**FIFTH CLAIM FOR RELIEF**
**Violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**Fla. Stat. §§ 501.201,** *et seq.*
***(On Behalf of the Florida Subclass Against All Defendants)***

113.    Plaintiffs, individually and on behalf of the Florida Subclass incorporate by reference all the allegations contained in paragraphs 1-75 of this Class Action Complaint as if fully set forth herein.

114.    Defendants have violated the Florida Deceptive and Unfair Trade Practices Act through "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."[27]

115.    As stated previously, Defendants sold products that were contaminated with lead and chromium. Its cinnamon was likely intentionally adulterated for economic benefit with toxic lead chromate.  They sold goods representing they had a quality that they did not have.

116.    Moreover, Defendants wrongfully claimed their product was healthy, high quality, safe, and appropriate to eat.  The extremely high levels of lead and heavy metals in the product means it should not have been consumed by anyone.

---

[27]Fla. Stat. § 501.204.

117.    Defendants claimed to "guarantee" the safety of their product when the product was, in fact, unsafe.

118.    Defendants knew or should have known their product did not have the advertised qualities at the time of sale.

119.    WanaBana's representations, acts, practices, and omissions were likely to and did deceive and mislead reasonable consumers in Florida, including Plaintiffs, about the safety and quality of WanaBana products and practices, to their detriment.

120.    Had WanaBana disclosed the truth about its products they would not have been purchased by anyone, or at minimum would sell for vastly less.

121.    WanaBana's deceptive and unlawful practices impact the public and the marketplace.  WanaBana's products cannot be used for their intended purpose, and anyone who purchased the Products, used the products, or consumed the food was harmed.

122.    As a direct result of WanaBana's deceptive, unfair, and unlawful practices and omissions, Plaintiffs and Florida Subclass members have been harmed.  They are entitled to recover actual damages to the extent permitted by law, including as a class action, in an amount to be proven at trial, as well as attorneys' fees, and any other just and proper relief available at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Nationwide Class and Subclass, request that the Court order the following relief and enter judgment against Defendants as follows:

A.    An Order certifying the proposed Nationwide Class and Subclass under Federal Rule of Civil Procedure 23;

B.   An Order appointing Plaintiffs to represent the Nationwide Class and Subclass and their counsel as Class Counsel;

C.   A declaration that WanaBana engaged in the illegal conduct alleged herein;

D.   An Order that WanaBana be permanently enjoined from its improper activities and conduct described herein;

E.   A Judgment awarding Plaintiffs and the Nationwide Class and Subclass restitution and disgorgement of all compensation obtained by WanaBana from its wrongful conduct;

F.   A Judgment awarding Plaintiffs and the Nationwide Class and Subclass compensatory damages and punitive damages, where available, in an amount to be proven at trial;

G.   Prejudgment and post-judgment interest at the maximum allowable rate;

H.   An Order awarding Plaintiffs and the Nationwide Class and Subclass reasonable litigation expenses, costs, and attorneys' fees;

I.   An Order awarding such other injunctive and declaratory relief as is necessary to protect the interests of Plaintiffs and the Nationwide Class and Subclass; and

J.   An Order awarding such other and further relief as the Court deems necessary, just, and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury for all claims and issues so triable.

**MILLER SHAH LLP**

*/s/ Nathan C. Zipperian*
Nathan C. Zipperian (FL Bar No. 61525)
1625 N. Commerce Pkwy., Suite 320
Ft. Lauderdale, FL 33326
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: nczipperian@millershah.com

Robert C. Schubert (*pro hac vice* to be filed)
Dustin L. Schubert (*pro hac vice* to be filed)
Amber L. Schubert (*pro hac vice* to be filed)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St., Suite 200
San Francisco, CA  94123
Telephone: (415) 788-4220
Fax: (415) 788-0161
Email: rschubert@sjk.law
        dschubert@sjk.law
        aschubert@sjk.law

*Counsel for Plaintiffs and the Putative Classes*